## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL E. LOCKHOFF,<br>**Plaintiff,** | CIVIL ACTION |
| **v.** | |
| ISAIAH SLONAKER, IV and STEPHEN<br>M. KAMNIK,<br>**Defendants.** | NO. 16-2893 |

## <u>MEMORANDUM OPINION</u>

On July 29, 2015, Pennsylvania State Police Troopers Stephen M. Kamnik and Isaiah

Slonaker, IV ("Defendants") conducted a traffic stop and arrested the Plaintiff, Michael E.

Lockhoff, who brought this suit challenging the manner in which he was arrested and his

subsequent prosecution. Remaining in this case are Lockhoff's federal claims against

Defendants in their individual capacities for excessive force, false arrest, and malicious

prosecution. He principally asserts, pursuant to 42 U.S.C. § 1983, that Defendants violated his

rights under the Fourth Amendment to the United States Constitution to be free from

unreasonable search[1] or seizure. His remaining state law claims are for civil conspiracy,

intentional infliction of emotional distress, assault and battery, and malicious prosecution.

Before the Court is Defendants' motion for summary judgment, which shall be granted in part

and denied in part.

---

[1] The Section 1983 claims assert "unreasonable and excessive force" (Count I), "false arrest and false imprisonment" (Count II), and "malicious prosecution" (Count VII). No count specifically alleges an unreasonable *search*, although the Complaint asserts elsewhere that an unreasonable search took place. Nonetheless, the parties have proceeded as though a Section 1983 claim for unreasonable search was properly alleged here, and have fully briefed the legality of the frisk of Lockhoff's person and the car search. Accordingly, the Court will address the merits of the arguments on the unreasonable search claims, in addition to the excessive force, false arrest and malicious prosecution claims.

## I.    Background

### A.  Traffic Stop and Arrest

The events in this case unfolded as Lockhoff – then seventeen years old – was driving home from his summer job with a landscaping company.  At approximately 12:30 p.m., the Defendants observed Lockhoff's car make a left turn on a steady red light.  They also believed that the dark tint on the car windows exceeded the legal limit.  Accordingly, they initiated a traffic stop, and Lockhoff pulled over to the side of the road.  Defendants' dashboard mounted Mobile Video Recorder ("MVR") was activated once they began following Lockhoff, and it recorded much of the subsequent interaction.  At one point, out of range of the MVR viewfinder, one can hear but not see what is happenening.  At the beginning of the encounter, Kamnick informed Lockhoff that he was being "audibly and visually recorded."

Kamnick got out of the patrol car first and went to the front passenger window.  Slonaker also got out, and stood several feet from the rear driver side corner of Lockhoff's car.  Kamnick told Lockhoff that he had pulled him over because he turned left on red, and because of the window tint.  Kamnick can be heard on the MVR recording telling Lockhoff that he smelled the odor of marijuana coming from the car.  Lockhoff testified that his car did not smell like marijuana but also testified that he did not know at the time of the incident what marijuana smelled like.  Kamnick also saw open packages of cigar wrappers in the car.  Lockhoff does not deny that the wrappers were in the car but says, that if they were, they were there because he is a cigar smoker.  The parties agree that after requesting Lockhoff's license, registration, and proof of insurance, this exchange took place:

Kamnick: "How much weed do you have in the car?"

Lockhoff: "None."

Kamnick: "Ok.  Why don't you just hand it over?"

Lockhoff: "Because I don't have any so I can't hand over what I don't have."

Kamnick: "Really?"

Lockhoff: "Yes sir."

Kamnick: "So you're going to give me a hard time?"

Lockhoff: "Yes I am, actually, because I don't have any pot in the car at all. I don't have any pot in the car so I can't help you . . . ."  [ . . . ]

Kamnick: "[I]t smells like weed, ok, so when was the last time you smoked in the car?"

Lockhoff: "Uh not often at all, because I don't smoke."

Kamnick then instructed Lockhoff to shut off the engine and to remain in the car while he went back to the patrol car to check Lockhoff's information.

After several minutes, Kamnick returned to the driver's side of Lockhoff's car and told him to step out.  Lockhoff did not comply, but instead repeatedly asked Kamnick to explain why he was being told to exit.  Kamnick responded that he was going to issue a traffic citation, and that he preferred not to do so while standing in the road.  Kamnick then said "you're going to get out of the car, either on your own free will, or I'm going to pull you through this window." Lockhoff continued to request an explanation, and after Kamnick repeated his instructions to step out of the car several more times, Lockhoff complied.

After getting out, Lockhoff manually locked the car door, put the key into his left pocket, and inserted both hands into his pockets as he walked to the grass shoulder behind his car, followed by the Defendants.  Initially, Kamnick instructed him to "take your hands out of your pockets," and Lockhoff did so.  Kamnick and Lockhoff began to discuss the red light violation, and when questioned, Lockhoff agreed that the light was "clearly red" when he made the turn.

Lockhoff then put his hands back in his pockets, prompting Kamnick to say "keep your hands out of your pockets, this is the last time I'm going to tell you, ok?"  In response, Lockhoff removed his hands from his pockets, took a step backwards, reached his hands back into his pockets and turned them inside out – showing that they contained nothing but his keys and phone – while saying with visible agitation, "dude, chill, I don't got anything in my pockets."  Kamnick then repeated, "I told you to keep your hands out of your pockets."  Despite these warnings, Lockhoff put his hands back in his pockets and said, "I'm not going to do anything dude, why are you freaking . . . you're just like trying to go after me because I'm [inaudible]."  At this point, Kamnick announced that Lockhoff was making him nervous because he refused to keep his hands out of his pockets, and so he directed Lockhoff to stand against the car and frisked him. Apart from the keys and phone, Kamnick did not find anything.  After the frisk, Lockhoff turned around, leaned back against the car, and put his hands back into his pockets.

Next, there was a brief discussion of the window tint violation – which Lockhoff disputed – before Kamnick again brought up the smell of marijuana.  Lockhoff categorically denied ever having smoked marijuana, or ever having had marijuana in his car.  Kamnick then asked whether Lockhoff had any guns, knives, cocaine or heroin in the car, which Lockhoff also denied. Finally, Kamnick asked for permission to search the vehicle, which Lockhoff flatly refused.

Believing that he had a sufficient basis to search Lockhoff's vehicle without a warrant because of the smell of marijuana, Kamnick asked Lockhoff to go with Slonaker to stand by the patrol car for safety reasons.  Lockhoff inquired at least four times why he was being asked to do so, and each time Kamnick repeated the instruction without explaining that he intended to search the car.  As this exchange took place, Kamnick moved behind Lockhoff, and then, lightly pushed Lockhoff towards Slonaker.  Lockhoff took a step away from the car, at which point Kamnick

grabbed ahold of Lockhoff's right arm. Abruptly, Kamnick placed his free hand on the back of Lockhoff's neck and forcefully pushed him forward onto the side of the trunk. While holding Lockhoff in place, Kamnick bent Lockhoff's arms at the elbows, brought them up behind his back, and placed handcuffs on his wrists. Slonaker provided assistance by putting his hand on Lockhoff's left arm.

As he was being restrained, Lockhoff repeatedly expressed disbelief at the Defendants' actions, yelling out "what the fuck are you guys doing" and "you guys are fucking crazy." In response, Kamnick stated "you're just being detained, alright, you're not under arrest." As Lockhoff continued to protest, the Defendants walked him towards the passenger side of their patrol car – out of view of the MVR, but still within its audio range.

What happened next is the subject of some dispute. The parties agree that as they moved off-camera, Kamnick first pushed the now-handcuffed Lockhoff against the passenger side of the patrol car. They also agree that Kamnick then reached into Lockhoff's pocket in order to retrieve the car keys. However, the parties diverge with respect to what Lockhoff did in response. According to Kamnick, Lockhoff "made a jerky motion away from [him]," and struck him in the belt with his right elbow, leading him to believe that Lockhoff was attempting to fight or flee. Slonaker says he saw Lockhoff attempting to turn away from Kamnick's grip. Lockhoff agreed that he only "moved [his] leg a little bit," but denied "twisting [his] body away from [Kamnick's] grip," or doing anything else. All agree as to what happened next: Kamnick forcefully took Lockhoff to the ground, and held him there, face down. With respect to what transpired while Lockhoff was on the ground, the parties' accounts diverge once more. According to Lockhoff, he complied with Kamnick's commands. But Defendants assert that Lockhoff continued to resist once he was on the ground, trying to push himself up, which

required the continued application of physical force to restrain him. According to the Defendants, Kamnick placed his knee on Lockhoff's arm, and continued to apply force to prevent Lockhoff from getting up.

There is no dispute that most of the force was exerted by Kamnick, and that Slonaker did little more than hold Lockhoff's legs once Kamnick had already brought him to the ground. It is also undisputed that the take-down and restraint resulted in superficial injuries to the area of Lockhoff's right eye socket, forehead, wrists, and lower back. The audio captured by the MVR can be clearly heard. Lockhoff can be heard yelling "[inaudible] . . . no, what are you doing," followed by sounds of a scuffle and heavy breathing. Kamnick then says "stop resisting, will you"; Lockhoff responds in a strained voice "dude, you're taking my fucking keys out of my pocket," to which Kamnick replies "no shit." Lockhoff is next heard repeatedly yelling variations of "what the fuck," "what are you doing," and "get the fuck off me," followed by Kamnick saying "now you're under arrest." Kamnick tells Lockhoff to "relax," and to "sit up," while Lockhoff continues to verbally protest. Kamnick next tells Lockhoff to get up off his chest, and Lockhoff responds that he cannot. Kamnick then tells Lockhoff to "sit down" and says "don't move, don't fucking move" as Lockhoff continues to shout obscenities. However, given that the Defendants had removed Lockhoff out of view of the MVR, the video does not shed light on the parties' differences with respect to what took place in the moments before Kamnick took Lockhoff down and while Lockhoff remained on the ground. However, it does clearly reflect that during the scuffle, Kamnick informed Lockhoff that he was under arrest.

After securing Lockhoff beside the patrol car, the Defendants radioed in the arrest and called for a tow truck. Lockhoff contends that while he was handcuffed and seated on the ground by the patrol car, he asked Defendants to pick up his sunglasses, at which point Kamnick

intentionally stepped on them. Kamnick says he did not mean to step on them but may have done so accidentally during the scuffle. The audio captured by the MVR makes clear that Kamnick saw Lockhoff's sunglasses before he stepped on them, well after the scuffle had concluded.

**B. Car Search**

Subsequently, Slonaker moved Lockhoff into the back seat of the patrol car and Kamnick searched Lockhoff's car. He found a closed container holding a substance that he believed to be hash oil, which, according to him, smelled of marijuana. The video captures Kamnick showing the container to Slonaker, and explaining that the contents of the container are commonly referred to as "dabs," and that they "smell exactly like marijuana." Kamnick also recovered open packages of cigar wrappers, and a partially burnt cigar in the center console or ashtray that contained a "green leafy substance," that based on the smell and appearance, he believed to be marijuana. He also found what he believed to be marijuana seeds in the seat pocket behind the passenger's seat, in the glove compartment, and in a cardboard box on the trunk.

For his part, Lockhoff testified that earlier in the day, someone showed him a small multicolored container – which he admitted to be the same one that Kamnick subsequently discovered – and told him that it contained "dabs," which he understood to be a kind of marijuana extract. Lockhoff further testified that he gave this person – whose name and gender pronouns he denied knowing – a ride to work earlier in the day. He denied that the cigar papers were for marijuana, and said the partially burnt cigar was tobacco, not marijuana. He denied that the seeds were marijuana seeds, and said they were from his landscaping work.

Before the car was towed, the Defendants conducted a light transmission test to determine the legality of the tint on Lockhoff's windows.

### C. Release and Juvenile Court Proceedings

After Lockhoff's car was towed, the Defendants drove him to the Pennsylvania State Police barracks, and notified his mother, who came and picked him up. About one month later, on September 1, 2015, Kamnick filled out an Incident Report which indicates that on the same day "a Written Allegation was filed against LOCKHOFF." The summary judgment record does not include an affidavit of probable cause, or any other evidence pertaining to communications between the Defendants and the local prosecuting authority.

The acts of delinquency alleged in a petition subsequently filed in the Juvenile Court of Montgomery County included two marijuana possession charges, thirteen drug paraphernalia charges, a single charge for resisting arrest, two disorderly conduct charges, and five motor vehicle violations. Of the disorderly conduct charges, one was for fighting and the other was for obscene language. Of the motor vehicle violations, three appear to relate to the excessive window tint, one relates to the failure to operate with the required proof of insurance, and one relates to the red light violation. On December 14, 2015, Lockhoff admitted that he committed the summary offense of operating a vehicle with unsafe equipment, and all of the remaining charges were dismissed.

## II.    Legal Standard

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (first citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); then citing *Anderson*, 477 U.S. at 248-52). Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). On a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). On Defendants' motion for summary judgment, all facts are viewed in the light most favorable to Lockhoff, and all inferences are drawn in his favor. However, where, as here, the incident that is the subject of the lawsuit is recorded, to the extent that any witness's account is clearly contradicted by the recording, the facts are taken as they are depicted in the recording. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

To prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). As the Third Circuit has observed, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26). To

make a showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

## III. Discussion

### A. 42 U.S.C. § 1983 Claims

Defendants argue that the record does not support Lockhoff's Section 1983 claims and that they must be dismissed pursuant to the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The Supreme Court has observed that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions . . . protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To determine whether an officer is entitled to qualified immunity on summary judgment requires a two-step inquiry: (1) whether the facts, taken in the light most favorable to the plaintiff, would establish the violation of a constitutional right; and (2) whether the right at issue was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). After *Pearson*, a district court may, in its discretion, address either question first. 555 U.S. at 242.

"[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *County of Los Angeles v. Mendez*, No. 16-369, 2017 WL 2322832, at *7, --- S. Ct. --- (U.S. May 30, 2017). Where qualified immunity is

asserted, a genuine dispute of fact material to the reasonability of the officer's actions will preclude summary judgment, provided that under the plaintiff's version of facts, the violation would have been "clearly established at the time of the alleged wrongdoing." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 n.4 (3d Cir. 2015) (citation and quotation marks omitted); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("[W]hen . . . a court decides only the clearly-established prong . . . [i]n cases alleging unreasonable searches or seizures . . . [it] must take care not to define a case's context in a manner that imports genuinely disputed factual propositions." (quotation marks omitted)); *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Because the constitutionality of Defendants' actions depends on "the facts and circumstances within the officer's knowledge at the time of the investigative stop or arrest," *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007) (citations omitted), each challenged action is discussed in turn, and the issue of qualified immunity is addressed where required.

### i. Traffic Stop and Frisk

First, as to whether the Defendants acted lawfully when they stopped Lockhoff's car, ordered him out of the vehicle, and conducted a frisk, the parties agree as to the basic facts. It is undisputed that the Defendants observed Lockhoff turn left on a red traffic, and that the tint on his windows appeared to exceed the legal limit. It is perplexing, given the facts of record and the legal prism through which they must be viewed, that Lockhoff contends that Defendants lacked a sufficient basis to pull him over from the outset. The argument is without merit.

There is no question that a traffic stop is a "seizure" within the meaning of the Fourth Amendment. *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). However, so long as a police officer has reasonable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), *i.e.*, "'specific, articulable facts' . . . to

believe that an individual has violated the traffic laws," a routine traffic stop passes

constitutional muster  *Id.* at 397 (quoting *U.S. v. Cortez*, 449 U.S. 411, 416 (1981)); *see also*

*United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("[T]he Supreme Court established a

bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is

merely pretext for an investigation of some other crime." (citing *Whren v. United States*, 517

U.S. 806 (1996)).  Here, the Defendants had reasonable suspicion to make a traffic stop based on

their observation of Lockhoff's left turn on a steady red light (which he admitted in both the

MVR recording and in his deposition) and the window tint violation (which he admitted in the

underlying juvenile court proceeding) before making the stop.  *Cf. United States v. Lewis*, 672

F.3d 232, 237-38 (3d Cir. 2012) (finding no reasonable suspicion to support traffic stop based on

excessive window tint where there was no evidence put forth in suppression hearing that officer

who effectuated traffic stop actually observed the tint prior to making the stop).

Nor does the manner in which Defendants conducted the traffic stop offend the Fourth

Amendment.  It is "well settled that a police officer executing such a stop may exercise

reasonable superintendence over the car and its passengers . . . [and] may order the driver out of

the vehicle without any particularized suspicion."  *United States v. Bonner*, 363 F.3d 213, 216

(3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)).  As such, Kamnick

was within his rights to order Lockhoff to exit the vehicle to discuss the traffic citation.

Similarly, during a lawful traffic stop, a police officer may frisk the driver if the officer

also has a reasonable suspicion that the driver might be presently armed and dangerous.  *Bonner*,

363 F.3d at 216 (citing *Mimms*, 434 U.S. at 111-12 (extending *Terry* to traffic stops)).  This

requires that the officer be "'able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion.'"  *United States v.*

*Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (citing *Terry*, 392 U.S. at 21). Where such a basis exists, the officer may conduct the limited search for weapons provided for by *Terry*.

Defendants contend that Lockhoff's refusal to remove his hands from his pockets, coupled with his visible agitation, furnished circumstances from which Kamnick might have reasonably inferred that Lockhoff was armed and dangerous, thus supporting a *Terry* frisk. Nervous behavior alone, although certainly a relevant consideration, is generally not a sufficient basis for a frisk. *United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012); *United States v. Wilson*, 506 F.3d 488, 495 (6th Cir. 2007); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005); *United States v. Ford*, 333 F.3d 839, 844-45 (7th Cir. 2003); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). Similarly, there is no question that a detainee's refusal to remove his hands from his pockets when ordered to do so is a relevant consideration that may, in light of the totality of the circumstances, give rise to reasonable suspicion that would support a frisk. *United States v. Mouscardy*, 722 F.3d 68, 76 (1st Cir. 2013); *see also United States v. Cornelius*, 391 F.3d 965, 968 (8th Cir. 2004) (finding support for *Terry* frisk where detainee placed hand in pocket and refused to remove it); *United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002) (citing detainee's nervous behavior and refusal to remove hands from pockets as reasonable basis to conduct frisk). The question in this case is whether, in light of the totality of the circumstances, these two factors gave rise to the requisite level of suspicion that Lockhoff may have been armed.

The MVR recording shows that after being told twice to take his hands out of his pockets, Lockhoff turned his pockets inside out, clearly revealing that they contained nothing but his phone and keys. However, immediately afterwards, Kamnick told him a third time to keep his hands out of his pockets. Lockhoff ignored this instruction, and put his hands back in his

pockets. In light of this undisputed fact, when considered in conjunction with Lockhoff's

agitated manner, Kamnick could reasonably have inferred that Lockhoff was keeping his hands

in his pockets in order to secure a weapon concealed elsewhere underneath his shorts, and

therefore, had a sufficient basis to support a *Terry* frisk.

### ii. Investigative Detention and Car Search

Lockhoff next claims that Defendants violated his Fourth Amendment rights by detaining

him longer than necessary to issue the traffic citation. He is correct that for a routine traffic stop,

"[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably

should have been—completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)

(prolonging traffic stop to conduct dog sniff rendered seizure unreasonable, absent independent

reasonable suspicion to support the dog sniff). But a police officer may legitimately continue to

detain the occupants of a vehicle when, in the course of a lawful traffic stop, the officer develops

a reasonable, articulable suspicion that criminal activity beyond a mere traffic violation may be

afoot. *Id.* at 1616-17 (remanding for the Court of Appeals to determine in the first instance

whether reasonable suspicion existed to detain driver beyond initial traffic stop for dog sniff);

*accord United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was

justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal

activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle

and its occupants for further investigation." (citation omitted)). Consequently, the legality of

Defendants' continued detention of Lockhoff in order to question him about matters unrelated to

the traffic violation turns on whether they had reasonable suspicion of other criminal activity.

For this reason, it is necessary to address the parties' disagreement as to the factual

question of whether Lockhoff's car smelled of marijuana. In the MVR recording, Kamnick can

be seen approaching the front passenger side of the car alone and knocking on the window. After Lockhoff lowers the window, Kamnick asks for his license, registration and insurance information. In his deposition, Kamnick testified that at this point, he "could smell the odor of marijuana emanating from the vehicle." This account is confirmed by the recording, which clearly shows that within the first two minutes of the interaction, Kamnick questioned Lockhoff about the presence of marijuana, and specifically noted that he smelled marijuana. Kamnick also remarks on the smell of the marijuana to himself, and later, to the tow truck driver, as he conducts a search of the car following Lockhoff's arrest.

Slonaker testified that he did not smell marijuana initially because he was not in close proximity to an open window or door. However, he also testified that he did smell marijuana later, when Kamnick recovered what he believed to be dabs from the car. The recording confirms that at all times during the interaction, Slonaker was several feet away from an open window or door – he stood to the rear left of the car for the duration of the time that Lockhoff was in the car, and after Lockhoff got out, Slonaker went to the rear right side of the car. Accordingly, Slonaker's testimony is not inconsistent with Kamnick's because the video demonstrates that Slonaker did not have the same opportunity to observe whether the car smelled of marijuana until later in the interaction.

For his part, Lockhoff testified that his car did not smell of marijuana. However, he also testified that he did not, in fact, know what marijuana smells like. Accordingly, crediting Lockhoff's assertion, as the Court is required to, inextricably leads to the conclusion that his testimony as to the smell of marijuana has no basis, and so cannot serve to create a genuine issue of material fact on summary judgment.

Nor do the other two arguments that Lockhoff advances in his brief suffice to create a genuine issue. As the party opposing a properly supported summary judgment motion, Lockhoff is required to point to "affirmative evidence" in the record in order to establish a genuine issue of material fact. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). The first argument – that Defendants do not have sufficient training or experience in identifying marijuana – is flatly contradicted by the record, which indicates they received training in the police academy with respect to the smell of raw and burning marijuana, as well as its visual identification, and also the testimony that they had encountered marijuana in their experience with the Pennsylvania State Police.

The second – that Defendants never performed any testing to determine whether the materials seized from Lockhoff's car actually contained marijuana – is a spoliation argument. Specifically, Lockhoff contends that the failure to test the seized items deprived him of the ability to establish a genuine issue as to whether the items seized from the car were, in fact, marijuana, and by implication, whether the car actually smelled of marijuana. However, apart from the bare fact that the Defendants never submitted the seized items for testing, the summary judgment record does not contain evidence that would be necessary to establish whether spoliation has occurred, much less what an appropriate sanction would be.[2] Accordingly, Lockhoff has failed to point to affirmative evidence that would establish a genuine issue as to

---

[2] "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). As to the appropriate sanction, "key considerations . . . should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

whether his car smelled of marijuana, or whether the items seized actually contained marijuana. Therefore, Kamnick's detection of the marijuana odor, and his observation of multiple packages of cigar papers, gave him reasonable suspicion of criminal activity, making it permissible to prolong Lockhoff's detention beyond the initial traffic stop.

These same facts are also sufficient to establish that Kamnick had probable cause to believe that Lockhoff's car contained contraband. *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause."). Kamnick detected the smell of marijuana as he spoke with Lockhoff through the lowered front passenger window. As the MVR recording demonstrates, there were no other vehicles in the vicinity, thereby rendering the smell sufficiently particularized to support the existence of probable cause to search the car. As such, the Defendants had grounds to conduct a warrantless search of Lockhoff's vehicle under the well-established automobile exception to the Fourth Amendment's warrant requirement, which allows for the warrantless search and seizure of an automobile where "'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996)).

Finally, as to the manner in which the car search was conducted, Lockhoff's contention that the use of handcuffs automatically transformed the encounter into a seizure requiring probable cause is incorrect. *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) ("[P]lacing a suspect in handcuffs while . . . conducting an investigation [does not] automatically transform an otherwise-valid *Terry* stop into a full-blown arrest."). Here, Lockhoff repeatedly failed to step away from the car when instructed to do so. In light of this behavior, it was reasonable for the Defendants to use handcuffs in order to conduct the car search without risk of

interference from Lockhoff.  *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) ("[During] . . . an investigative stop . . . [officers] may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985))).

### iii.  Use of Force

Having concluded that the traffic stop, investigative detention, frisk and car search did not violate Lockhoff's Fourth Amendment rights, the Court can now address whether Defendants' use of force during the encounter was unconstitutionally excessive.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV.  From this language derives the right to be free from the use of excessive force during an arrest or investigative detention.  *Graham v. Connor*, 490 U.S. 386, 394 (U.S. 1989).  The excessive force inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (internal quotation marks and citations omitted).

Whether an officer's use of force is excessive depends on whether it is "objectively reasonable."  *Id.* at 397 (citations and quotation marks omitted).  This fact-bound determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396 (citing *Terry*, 392 U.S. at 20-22).  Relevant factors under the objective reasonableness test set forth in *Graham* include "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene."  *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham*, 490 U.S. at 396).  The Court may

also consider "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id.* (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (*abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007)). As such, the requisite analysis accounts for the totality of the circumstances. *Curley*, 499 F.3d at 207.

During the encounter, there were two instances in which the Defendants used force against Lockhoff: the first was on-camera, when they placed him in handcuffs behind his car, and the second was off-camera, when Kamnick took Lockhoff to the ground at the side of the patrol vehicle and held him there with Slonaker's assistance.

With respect to the first use of force, the undisputed facts in the record make it clear that there was no Fourth Amendment violation. It is well-settled that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Where, as here, the use of handcuffs is allowed during an investigative detention, the officers may use so much force as reasonably necessary to apply them, but not more. *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). Lockhoff is unable to identify facts from which it could be concluded that Defendants' use of force to place him in handcuffs was objectively unreasonable. Although Kamnick did forcefully push Lockhoff by the neck forward onto the trunk, he did so only after Lockhoff had repeatedly declined to comply with his instruction to go with Slonaker to stand by the patrol vehicle, and then took a step away from the car. The injuries to Lockhoff's face did not happen them – the MVR recording clearly shows his sunglasses still intact and securely on his face as he is walked

off-camera.  Accordingly, there is no genuine issue that precludes summary judgment in Defendants' favor on the excessive force claim with respect to the on-camera use of force.

With respect to the off-camera use of force, the record requires a different conclusion. Without the benefit of a visual recording of what took place at the side of the patrol car, the Court must rely on the audio recording and the parties' accounts.  As has been seen, these diverge with respect to the following factual issues: in the moments before the take-down, whether Lockhoff was turning his body away from Kamnick, and whether Lockhoff struck Kamnick in the belt with his elbow; and once Lockhoff was on the ground, whether he was physically compliant.  In Defendants' version of events, Kamnick's use of force was a measured response to a physically noncompliant detainee.  But according to Lockhoff, he was physically – if not verbally – compliant, and Kamnick's post-handcuffing use of force against a subdued detainee was essentially gratuitous.

Crediting Lockhoff's version of events, a jury could find that Kamnick's use of force was unreasonable under the *Graham* factors.  Taking them in turn, the seriousness of the suspected offense – here, simple traffic violations and possible marijuana offenses – weighs mostly in Lockhoff's favor.  Although Defendants contend that they did not know whether they were dealing with a potential simple possession or a drug trafficking offense, beyond the smell of marijuana and the cigar papers there were no facts to suggest that they were dealing with a drug trafficker or potentially violent individual.  Nor was Kamnick confronted with facts from which it could be inferred that Lockhoff was armed or otherwise posed an imminent safety threat to himself or others.  Kamnick had already frisked him and found that he did not have any concealed weapons.  Perhaps most critically, Lockhoff had already been placed in handcuffs, and was being detained against the patrol vehicle by two state troopers.  And as to the third *Graham*

factor, under Lockhoff's version of events, he was not attempting to resist or to flee. In light of the foregoing, a reasonable jury could conclude that the governmental interest did not warrant the nature and quality of the intrusion effected by Kamnick, namely, the take-down and forcible restraint of a detainee after he had already been subdued, with sufficient force to cause the visible injuries demonstrated by the record. Therefore, Lockhoff has established a genuine issue with respect to whether Kamnick's off-camera actions violated the Fourth Amendment.

With respect to Slonaker's off-camera actions, Defendants argue that even if Kamnick's take-down and restraint of Lockhoff was unreasonable, Lockhoff has failed to establish a genuine issue as to Slonaker's conduct. In describing what Slonaker did, Lockhoff does not argue that Slonaker's actions resulted in his injuries. Indeed, he testified that Slonaker did not do anything until Lockhoff was on the ground, and that "[h]e kind of just stood by and put a hand on me. He really didn't do much." This level of force, exercised against a lawfully detained individual, obviously cannot establish a Fourth Amendment excessive force claim. However, Slonaker may not escape liability if he had the "opportunity and means" to intervene in Kamnick's unconstitutional use of force. *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (citation and quotation marks omitted); *accord Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002) (holding that correctional officer in Section 1983 Eighth Amendment suit may be liable for another officer's use of excessive force whether there was a reasonable opportunity to intervene). Because Lockhoff testified that he was injured in part due to the force that Kamnick applied while he was on the ground, Lockhoff has established a genuine issue with respect to whether Slonaker had the opportunity to perceive what was going on and to intervene to stop it. *Burgess*, 735 F.3d at 475; *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005).

Having concluded that Lockhoff has made out a constitutional violation, it is necessary to proceed to the question of qualified immunity, namely, whether it was clearly established on July 29, 2015, that the Defendants' actions under Lockhoff's version of events would have amounted to a Fourth Amendment violation. It has been repeatedly emphasized that what constitutes "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Because the objective reasonableness test set out in *Graham* is "cast at a high level of generality," it alone will not suffice to clearly establish that an officer's use of force was constitutionally excessive, except "in an obvious case." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citation omitted). There need not be "'a case directly on point' for a right to be clearly established, '[but] existing precedent must have placed the statutory or constitutional question beyond debate.'" *White*, 137 S. Ct. at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (holding that a "materially similar" case is not required where prior cases render unlawfulness apparent)).

Defendants argue that it is not clearly established that police officers violate a detainee's Fourth Amendment rights simply by tackling him. In this case, however, the relevant question is not whether it is clearly established that tackling a lawfully detained individual violates the Fourth Amendment. Rather, the Court must inquire whether it is clearly established that tackling and restraining on the ground an unarmed, handcuffed, physically compliant individual who has effectively been subdued, with sufficient force to cause the injuries suffered here, is unreasonable under the Fourth Amendment. Assuming the veracity of Lockhoff's version of

events, this case falls into the category of obvious cases under *Graham.* Where an individual suspected of a nonviolent offense, who has been frisked for weapons and placed in handcuffs, is in the custody of two officers and is physically compliant, there is simply no governmental interest that would justify the continued post-restraint use of force at issue here. Under the balancing test set forth in *Graham*, the continued use of force once a detainee has been subdued violates the Fourth Amendment.

But even if the general test in *Graham* did not clearly establish the violative nature of the alleged conduct, the Courts of Appeal that have directly addressed the issue have had little trouble concluding that the continued use of force by a police officer after a detainee has been subdued is a clearly established Fourth Amendment violation. *See, e.g.*, *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (holding that it was clearly established in 2011 that "officers may not continue to use force against a suspect who is effectively subdued"); *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) ("[T]he contours of the right at issue were sufficiently clear to inform a reasonable officer in Officer Hooper's position it was unlawful for him to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee."); *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009) ("It was clearly established that the use of this type of gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment." (citations omitted)); *Hadley v. Gutierrez*, 526 F.3d 1324, 1333-34 (11th Cir. 2008) ("We hold that a handcuffed, non-resisting defendant's right to be free from excessive force was clearly established in February 2002."); *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007) ("No reasonable officer could have thought that it was . . . proper to continually grind his knee into the face of an

unresisting arrestee."); *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (holding that post-handcuffing application of mace and kneeling on the back of fourteen year old was clearly unconstitutional under *Graham* factors); *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) ("[C]ourts have . . . consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner, and thus, are not entitled to qualified immunity."); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]there was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was."); *see also Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (holding that it was clearly established by 2001 that the Eighth Amendment prohibits an officer's gratuitous use of force against a subdued inmate); *Green v. New Jersey State Police*, 246 F. App'x 158, 167 (3d Cir. 2007) (Garth, J., dissenting) (dissenting from denial of qualified immunity and noting that the case did not involve "gratuitous violence on a handcuffed and compliant arrestee").

Moreover, the three cases Defendants rely on to argue that the governing law is not clearly established are factually distinguishable because the use of force at issue in each took place *before* the detainee was handcuffed or otherwise subdued.[3] As such, these cases are insufficiently particularized to the facts at issue, and so cannot satisfy the Defendants' ultimate burden of persuasion as to qualified immunity. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Therefore, a genuine issue exists as to whether the Defendants' use of force was

---

[3] *Ankele v. Hambrick*, 136 F. App'x 551, 554 (3d Cir. 2005) ("[W]e agree with the District Court that the force Hambrick applied in arresting Ankele-specifically, grabbing Ankele, throwing him onto the police car, and handcuffing him-was not excessive."); *Boroff v. Lynn*, 643 F. App'x 130, 133 (3d Cir. 2016) (holding that New Jersey State Police Trooper's tackling of "inebriated, disorderly, uncooperative, and combative" individual who had repeatedly tried to escape the Trooper's grasp was not unreasonable); *Thomas v. City of Erie*, 236 F. App'x 772, 776 (3d Cir. 2007) (finding no Fourth Amendment violation where police forced force was used to handcuff arrestee who went limp and put his hands beneath his body to resist handcuffs).

excessive under clearly established law, and the Defendants' motion for summary judgment will be denied insofar as the excessive force claim is based on the off-camera use of force.

### iv. False Arrest

Next is Lockhoff's claim that his arrest violated the Fourth Amendment because the Defendants lacked probable cause to arrest him. Based on the undisputed facts in the record, Defendants are entitled to summary judgment on this claim.

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). Thus, the existence of probable cause as to any offense will defeat a Section 1983 plaintiff's false arrest claim. *Id.* at 155 ("Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest."); *Wright v. City of Philadelphia*, 409 F.3d 595, 603-04 (3d Cir. 2005).

Here, probable cause to arrest Lockhoff existed by virtue of the undisputed fact that Defendants observed him violate several motor vehicle laws. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Virginia v. Moore*, 553 U.S. 164, 176 (2008). Because Lockhoff has admitted to running a red light, which is a violation of 75 Pa. Cons. Stat. § 3112(a)(3), and also to operating a vehicle with unsafe equipment in violation of 75 Pa. Cons.

Stat. § 4107(b)(2), there is no dispute that Defendants had probable cause to arrest him when they observed these offenses. Accordingly, his Section 1983 false arrest claim cannot withstand Defendants' motion for summary judgment.

### v. Malicious Prosecution

Lockhoff's last Section 1983 claim is for malicious prosecution in violation of the Fourth Amendment.[4] This requires showing that:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Black v. Montgomery Cty.*, 835 F.3d 358, 364 (3d Cir. 2016) (emphasis removed) (quoting *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)), *as amended* (Sept. 16, 2016). Defendants move for summary judgment on the grounds that Lockhoff cannot establish the first, third, and fifth elements.

As to the first element, there is no evidence to show that Slonaker "initiated a criminal proceeding," and so summary judgment will be entered in his favor as to the Section 1983 malicious prosecution claim. However, there is record evidence of communication between Kamnick and the prosecuting authority, found in the Incident Report that he completed, which refers to a "Written Allegation" having been "filed." From this, a jury could reasonably infer

---

[4] Count Seven of the Complaint invokes the Fourteenth Amendment, in addition to the Fourth Amendment, as a basis for the Section 1983 malicious prosecution claim. Defendants' motion does not distinguish between the possible constitutional bases for the claim. In response, Lockhoff does not argue that the Fourteenth Amendment provides a basis for the Section 1983 malicious prosecution claim, and instead relies solely on the Fourth Amendment. Accordingly, he has waived any Section 1983 malicious prosecution claim rooted in the Fourteenth Amendment. *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("In the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned.").

that Kamnick initiated a prosecution against Lockhoff. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.2 (3d Cir. 1998).

As to the third element, the Court must consider whether probable cause existed for each of the offenses charged. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477 (3d Cir. 2016). For the reasons previously discussed, probable cause existed as to the traffic violations, as well as for the marijuana and paraphernalia offenses, notwithstanding Lockhoff's protestations about the absence of any testing on the seized items.[5] However, there is a genuine issue as to whether probable cause existed to charge Lockhoff with resisting arrest in violation of 18 Pa. Cons. Stat § 5104, and disorderly conduct by fighting in violation of 18 Pa. Cons. Stat. § 5503(a)(1). Without the benefit of an affidavit of probable cause, or deposition testimony as to the contents of Kamnick's communications with prosecutors, it cannot be known precisely what information Kamnick conveyed. If it was consistent with the narrative section of Kamnick's Incident Report, which states that, while at the side of the patrol vehicle, "LOCKHOFF pulled away from my grasp in a violent manner with his right elbow striking my belt," as has previously been established, there is a genuine dispute as to whether this actually occurred. If, as Lockhoff testified, it did not, then filing a written allegation to the contrary could amount to initiating a criminal proceeding without probable cause. Accordingly, the Court may not at this juncture conclude, as a matter of law, that Kamnick had probable cause to initiate criminal proceedings as to these two charges.

---

[5] As the recording demonstrates, probable cause also existed for the disorderly conduct by obscene language charge by virtue of Lockhoff's language and the location on a highway. 18 Pa. Cons. Stat. §5503(a)(3), (c). Additionally, to the extent that Lockhoff suggests that the Defendants lacked probable cause to file a written allegation on the motor vehicle summary offenses, knowing that the 30 days limitation imposed by 42 Pa. Cons. Stat. 5553(a) since the date of the incident had elapsed, the statute of limitations is an affirmative defense that does not affect the existence of probable cause. *Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007).

With respect to the fifth element, insofar as Defendants contend that Lockhoff effectively conceded this claim by acknowledging that his liberty was not deprived beyond the 2-3 hours he spent in police custody and the time spent at a juvenile court hearing, Defendants ignore the Third Circuit's recent holding in *Black*. There, the Third Circuit adopted the test for the sufficiency of a deprivation set out in Justice Ginsburg's concurrence in *Albright v. Oliver*, 510 U.S. 266 (1994), which held that a criminal defendant who is released before trial, but is nonetheless obligated to attend pretrial court appearances remains "effectively seized" so long as the prosecution is pending. *Black*, 835 F.3d at 367-68 (quoting *Albright*, 510 U.S. at 278-79 (Ginsburg, J., concurring)). Under this test, Lockhoff suffered a deprivation of liberty sufficient to support a Fourth Amendment malicious prosecution claim.

Finally, although Defendants generally assert qualified immunity to all the Section 1983 claims, they do not advance any legal argument specifically addressing their entitlement to qualified immunity on the malicious prosecution claims. In any event, it is clearly established that a police officer's falsification of evidence violates the constitution. *Halsey v. Pfeiffer*, 750 F.3d 273, 293-96 (3d Cir. 2014). Therefore, the motion for summary judgment on the Section 1983 malicious prosecution claim against Kamnick will be denied with respect to the charges for resisting arrest in violation of 18 Pa. Cons. Stat § 5104, and disorderly conduct by fighting in violation of 18 Pa. Cons. Stat. § 5503(a)(1), and granted with respect to all remaining charges.

**B. State Law Claims**

Defendants argue that they are entitled to sovereign immunity on Lockhoff's remaining state law claims. "The Eleventh Amendment to the United States Constitution protects an unconsenting state or state agency from a suit brought in federal court, regardless of the relief sought." *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009).

"[U]nless Congress has 'specifically abrogated' [a] state['s] sovereign immunity or a state has unequivocally consented to suit in federal court," the federal courts lack jurisdiction over suits against a state by a citizen of that state. *Christ the King Manor, Inc. v. Sec'y United States Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) (citation omitted). Under Pennsylvania law, except insofar as they do not act within the scope of their employment, state employees, including Defendants, are entitled to sovereign immunity. *Holt v. Nw. Pa. Training P'ship Consortium*, 694 A.2d 1134, 1139 (Pa. Commw. Ct. 1997) ("[A]n employee of the Commonwealth . . . acting within the scope of his or her employment or duties, is protected by sovereign immunity from the imposition of liability for intentional tort claims."); *see* 1 Pa. Cons. Stat. § 2310 ("[T]he Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.").

The Third Circuit has predicted that Pennsylvania would apply Section 228 of the Restatement (Second) of Agency to determine whether actions are within the scope of an official's employment. *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000). Under the Restatement, "'conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master.'" *Id.* (quoting Restatement (Second) of Agency § 228) (modifications in *Brumfield*). Activity may be within the scope of employment even if the acts are "intentional or criminal," and "even unauthorized acts may be within the scope of employment if they are clearly incidental to the master's business." *Id.* at 381 (internal quotation marks omitted). However, in the context of law enforcement-related claims, "[w]here the alleged intentional tort was unprovoked,

unnecessary or unjustified by security concerns or penological goals, courts have ruled that such conduct does not, as a matter of law, fall within the scope of employment." *Wesley v. Hollis*, No. 03-cv-3130, 2007 WL 1655483, at *15 (E.D. Pa. June 6, 2007) (collecting cases in which courts denied sovereign immunity-based motions to dismiss filed by corrections officers). Here, it is undisputed that the Defendants' conduct was of a kind they were employed to perform, within the authorized time and space limits, and so the availability of sovereign immunity turns on whether the challenged conduct is within the scope of the employment.

With these principles in mind, Lockhoff's state law claims are addressed in turn.

### i. Civil Conspiracy

To prove a civil conspiracy under Pennsylvania law, "it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy. This unlawful intent must be absent justification." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) (citations omitted). With respect to the requisite agreement, concert of action alone is insufficient. *Fife v. Great Atl. & Pac. Tea Co.*, 52 A.2d 24, 39 (Pa. 1947) ("The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy.").

Here, Defendants assert that there is no record evidence of an agreement to act unlawfully apart from the apparent concert of action between Kamnick and Slonaker. Lockhoff does not point to any additional facts in the summary judgment record from which a jury could infer the existence of a conspiratorial agreement, nor has the Court identified any facts that would "raise[] more than a mere suspicion of concerted action." *Fife*, 52 A.2d at 27. Thus, summary judgment will be granted in Defendants' favor on the conspiracy claim.

### ii. Intentional Infliction of Emotional Distress

Turning next to Lockhoff's claim for intentional infliction of emotional distress ("IIED"), the Pennsylvania Supreme Court has not formally recognized a standalone tort for IIED, but has implied that if it were to, the "minimum elements necessary to sustain such a cause of action" would be those set forth at the Restatement (Second) of Torts § 46. *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000) (citations omitted). Nonetheless, the Pennsylvania Superior Court has recognized a standalone IIED claim, and has cited Section 46 as having provided "guidance" to its elements. *Swisher v. Pitz*, 868 A.2d 1228, 1231 n.2 (Pa. Super. Ct. 2005). The Third Circuit has also predicted that the Pennsylvania Supreme Court would follow Section 46. *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010); *Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 890 (3d Cir. 1998). In pertinent part, that section imposes liability against "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) § 46(1).

In addition, however, the Pennsylvania Supreme Court has indicated that the tort would require "objective proof of severe emotional distress . . . supported by competent medical evidence." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (1987); *accord Gray v. Huntzinger*, 147 A.3d 924, 929 (Pa. Super. Ct. 2016). Here, there is no objective proof – much less, competent medical evidence – in the record to suggest that Lockhoff has suffered severe emotional distress. Therefore, summary judgment will be granted in Defendants' favor on the claim for intentional infliction of emotional distress.

### iii. Assault and Battery

Defendants contend that their use of force was within the scope of their employment with the Pennsylvania State Police. However, as with their argument on the issue of qualified immunity, Defendants conflate the use force to effect a lawful arrest or detention – which would clearly be within the scope of their employment – with the use force *after* an individual has already been subdued. In the latter case, it can hardly be said that state troopers are engaged in the kind of work they are hired to perform when they gratuitously use force after any reason to do so has passed. For this reason, a state law claim for assault and battery against police officers alleged to have used excessive force that is "unprovoked, unnecessary or unjustified by security concerns or penological goals," is not foreclosed by sovereign immunity. *See, e.g.*, *Minyard v. City of Philadelphia*, No. CIV.A. 11-246, 2012 WL 3090973, at *6 (E.D. Pa. July 31, 2012) (quoting *Wesley v. Hollis*, No. CIV.A. 03-3130, 2007 WL 1655483, at *15 (E.D. Pa. June 6, 2007)).

Here, Lockhoff has established a genuine issue of material fact with respect to whether Defendants' use of force after he was handcuffed was excessive, which precludes Defendants from invoking sovereign immunity. Accordingly, the summary judgment will be granted in part and denied in part to the same extent as the Section 1983 excessive force claim.

### iv. Malicious Prosecution

The elements of state law malicious prosecution in Pennsylvania are the same as those required for a Fourth Amendment malicious prosecution claim, with the exception of the fifth element requiring a showing of a deprivation of liberty consistent with the concept of a seizure. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791-92 (3d Cir. 2000). Having already concluded that the Section 1983 malicious prosecution claim against Slonaker may not proceed

because Lockhoff cannot establish that Slonaker initiated a criminal proceeding, summary judgment will be granted as to Slonaker on the state law malicious prosecution claim as well.

Similarly, having concluded that there is no genuine issue as to whether Kamnick had probable cause to support initiating all the charges against Lockhoff except for resisting arrest in violation of 18 Pa. Cons. Stat § 5104, and disorderly conduct by fighting in violation of 18 Pa. Cons. Stat. § 5503(a)(1), summary judgment on the state law malicious prosecution claim will be granted in Kamnick's favor on all but these two charges. However, Lockhoff's state law malicious prosecution claim against Kamnick on the resisting arrest and disorderly conduct by fighting charges is not barred by sovereign immunity because if a credits Lockhoff's version of events, Kamnick necessarily submitted a written allegation with false information. Because knowingly submitting false allegations to a prosecutor would not serve the interests of the Pennsylvania State Police or be otherwise justified by a legitimate penological purpose, such activity falls outside a Trooper's scope of employment, and so sovereign immunity is unavailable.

\*\*\*

An appropriate order follows.

DATED: June 5, 2017

**BY THE COURT:**

**/s/ Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**